Good morning, Your Honor, and may it please the Court. My name is Ed Humphrey, and I represent Greif & Co. Oh, I'm sorry. I said that wrong. I do too, still. Okay. The primary crux of Greif's dispute with this settlement is the liquidating trustee's conclusion that only about $65,000 in transfers to an American Express were recoverable under an employment contract fraudulent transfer theory. And what we think is that this conclusion does not demonstrate that there was an inadequate investigation into the facts forming the basis of the claim, and that the bankruptcy court's approval of a settlement based on this conclusion was an abuse of discretion. Why did your client decline to purchase the claims from the liquidating trustee? It was a lot of money. It was still $360,000 or $330,000, and it was my client's position that it had to stand independently under 9019, and you couldn't just bypass 9019 altogether by using procedures that had been approved in this court in Mickey Thompson as an option or Laihani as an option, which is a BAP case, that talks about the ability to potentially treat a 9019 as a sale of claims. But here the bankruptcy court accepted numerous filings, held a hearing, and stated that it considered everything that was proffered. Why isn't that enough to show it fully considered the case? What more would they have? Other than you disagree with it, what more should the bankruptcy court have done? I think that it has to show that it just wasn't rubber stamped. And if you go back to ANC Properties or Martin V. Cain, this Court's seminal decision on the settlement factors, the Court — this Court noted the issue, how difficult it was to assess whether or not a bankruptcy court weighed all the options correctly if it was not put on the record, and counseled that that should happen in the future. In ANC Properties, however, that problem was remedied because the parties specifically outlined the claims in the settlement agreement. And so you had a discussion of the claims in the actual settlement agreement and the factors that went into weighing that settlement, and also in the cost-benefit analysis in the agreement, so that this Court had an independent basis to weigh how the parties assessed the claims. And that wasn't done here, because in the supporting motion that was brought under Rule 9019, although the liquidating trustee said he thought something less applied, the business judgment rule or business judgment standard for review wasn't specifically mentioned in the moving papers. Well, the bankruptcy judge got around that by saying it met both. Well, that's true. That's true. And I'm not sure if it's not a distinction without a difference. I'm not sure if there is a huge difference between what the business judgment rule requires and what 9019 requires from a practical level. I think that what you don't have here is a discussion at all in the moving papers of or in the initial moving papers, anyway, of this theory at all, and that it weighed into the settlement discussion. And you don't have anything in a declaration saying that this claim was considered. Well, but okay. The bankruptcy court noted that the trustee provided, quote, a detailed explanation of his analysis included exhibits in support thereof, unquote. The bankruptcy court cited the trustee's, quote, extensive legal authority in his analysis of the facts in support of his good faith and informed belief that the complexity of the potential litigation makes the trustee's victory less clear-cut than Greif appears to argue, unquote. The bankruptcy court went on to identify the four ANC factors and noted that, quote, the differing legal viewpoints and factual analysis expressed both by Greif and the trustee clearly indicate the complexity of the issues, unquote. So, and because of the complexity, there would be a substantial expense and delay, quote, without a corresponding increase of the probability that the trustee would prevail to the extent Greif argues, unquote. So it's pretty – it's – With all deference, because I believe in most cases of First 1919 I've ever objected to, that that might be sufficient. In some cases, if there was actual demonstration that the parties' arguments were considered. And so the crux of the argument on the employment contract fraudulent transfer theory from the trustee's position is we started with the baseline that only $65,000 was recoverable under this theory, presumably because there was a medical expense reimbursement provision in the employment contract and it tied to it. But what I wanted to know and what I was trying to point out to the Court below is why is that medical expense reimbursement provision stronger than the general expense reimbursement provision right below it? And so you have a situation where medical expenses were reimbursable under Section 4.3 of the employment contract, and right below that in 4.4 you have expense reimbursement provision, and it's undisputed that about half of this $2.2 million at least half was made to reimburse the Coopers, according to themselves, for expenses that they fronted for the company. And so how good of witnesses are the Coopers going to be for your position? Well, I don't think that you need them. I think that the Coopers have demonstrated that they're not credible as witnesses through their discharge provisions. Oh, so the Court can just say you're not credible? I mean, in a litigation they can just say we're not going to believe anything that the Coopers say? Well, I think that their own admission in their offset chart showing that these were for expense reimbursements is enough. I don't think that they can get around that to say, yes, we were reimbursing ourselves. An act's murderer is entitled to a start of credibility. You impeach them. But, I mean, they are the witnesses here of whether something was a personal expense or not. And they have a motivation to make everything, you know, they have a motivation to not make things, you know, that wouldn't help you. I don't think that there's any dispute that half, $1.1 million, was made for expense reimbursements. It's not been disputed. It's not disputed by the Coopers. The Coopers themselves indicated that on the Amex charge, on the Amex statements themselves and in their offset accounting. And so there's no dispute that half was for expense reimbursements and the other half was for other items that the Coopers say gave them credits, such as bonuses, which are also in Section 4.2 of the employment contract, salary reimbursements, which is in Section 4.1, legal indemnification, which is in Section 20 of the employment contract. So your argument is even under a narrow interpretation of the employment clause, these things would qualify. Absolutely. That's my argument. And it's the argument that under either a broad or a narrow interpretation, it qualifies. If it was a broad interpretation, which I think it should be, given congressional intent in 2005 to add this provision specifically to help trustees claw back bonuses and other forms of indirect or direct compensation that was given to principals on the slide in the bankruptcy. But then it has to be shown that these weren't for value. Well, that also is shown directly on the face of the offset chart that the Coopers themselves prepared. Because if you look at that offset chart, which is at the record starting at ER 116, if you look at the right column, that's the balance that was running on this so-called offset for things like expense reimbursements or employment contract payments. About 80 percent or 90 percent of the at the time the Amex transfers were made, there was no debt owed to the Coopers under these agreements. And so if you look at 548D2, which specifically defines value, it requires there to be a present or antecedent debt. And here that debt would be to the Coopers, which that's what would provide value. So are we looking at an abusive discretion standard? Yes. I think you are. That's a harder standard for you. Well, I think if you look at the Arden case that I cited in the brief, it talks about abusive discretion in the context of a settlement review. If there was an incorrect interpretation of the law in here, I don't think there was any interpretation of what the law was and no indication in the record of what standard the judge relied on to assess the likelihood of success. Well, the judge said it, but the judge said that, was it he? Was it a he? It was a she. She. Okay. That ANC factors, but under both standards, found the settlement to be fair and equitable. So cited both standards. I think that you need to go a little bit deeper under ANC on the analysis. I think you should have put it in the record of why that position was wrong. I think what the position showed was a lack of investigation into the actual facts, and so there was not a sufficient factual foundation. And ANC says a settlement that's approved without a sufficient factual foundation is inherently an abuse of discretion. Okay. Do you want to reserve five minutes, or do you want to keep going? I would like to say with the value, it couldn't per se have qualified as value under D-2, because there was nothing owed to the Coopers at the time of the transfers to American Express. Okay. Good morning, Your Honors. Good morning, Your Honors. Robert Atkinson on behalf of Brian Shapiro, the appellee. We believe the BAP decision is sound. It's very well thought out. We're not going to review the BAP decision. As you know, the BAP does not we don't review the BAP. It's not an Article III court. That's correct. So if you could leave the BAP aside and go right to the bankruptcy judge, it would help me a lot. Will do. There are only two issues that are actually on appeal, both of them reviewed under the abuse of discretion standard. The abuse of discretion standard, as you know, is whether the underlying bankruptcy court failed to apply the applicable and correct legal standard or applies it in such a way that is illogical, implausible, or unsupported by the record. We see an inadequate argument on any of those three factors. Indeed, most of the appellant's brief is a rehash of what we would consider to be in the weeds, arguing the details of the possible merits and possible upside of an employment contract. It actually doesn't spend much time arguing the underlying bankruptcy court made an implausible application. I was going to say, were these arguments raised before the bankruptcy judge? Oh, yes. I mean, when you say these arguments, I can interpret that a couple of ways. In terms of the employment contract theory, it was brought up in both Grief's opposition to the original motion, it was discussed in the liquidating trustee's reply, it was discussed extensively in the supplemental objection of Grief, it was discussed in the supplemental reply of the liquidating trustee, it was discussed in oral argument by Grief at the hearing, it was discussed in oral argument by myself at the hearing. The issue of the broader narrow interpretation, I think, you know, it seems to me that the narrow interpretation is probably the way the law goes, but he's made an interesting argument that it's not just the medical expenses, but the general expenses weren't really considered. So do you think under a narrow interpretation of the employment transfer avoidability possibility that the general expenses were considered? And where do I find that the general expenses were considered? Because I thought maybe just the medical expenses were considered. We believe that Grief actually slightly mischaracterizes the main thrust of our argument. And that main thrust of the argument is that it's getting outside of the parsing of subsection 4's interesting wording, which would lead to a broad or a narrow review, but instead the argument is, is you have to look at the first prong, reasonable value in exchange. That's plus the ordinary course of business, with the Coopers being the essentially the only witnesses as to what that would be, that is the ultimate sense of the argument. In other words, we're arguing you don't really have to get into the details as to narrow versus broad if you accept that the majority of the argument was that, according to the offset chart, reasonable value was indeed received. And alternatively and completely dispositively, that the Coopers, who are the only substantive witnesses, will argue that all of these transfers are made in the ordinary  So with respect to, you know. Well, why did he just say that there was no antecedent debt owed to them under their employment contract when these transfers were made? That's an interesting argument, and it gets to answering your earlier question. If you take a look at the legislative history of subsection 4, which is very sparse, but it's discussed a little bit in that golden parachutes argument. The origination of that statute is because people were abusing the tension agreements and severance agreements and just seriously abusing the process, both right prior to the bankruptcy as well as after the bankruptcy, and just, you know, essentially looting companies under the guise of an employment contract. And if you take a look at what the nature of those contracts are, by implication, the transfers that are being discussed are transfers that are at the time that the contractor signed because there are obligations of the company. So we're arguing that even though the transfer chart will say amount owed, here's a balance, and here's an annex charge, and then there's an amount owed and so forth all the way down, that instead the actual transfer occurred at the time that the quarterly bonuses that hit, for example, that you see on the offset chart, those transfers were made at the time the original employment agreement was signed. And so, you know, in contrary to what Greif is arguing, you can't just match up one to one and saying, oh, there's money owed, oh, there's an offset, and rush it down. Let me ask you this. When the bankruptcy court considered the settlement, did it limit itself to just the B-4 of 548A? No, Your Honor. Okay. That was one of the trustees' arguments. But as I mentioned earlier, the primary thrust of the trustees' arguments is that he's going to get slaughtered on the reasonable value thing. This is not a claim that is worth much. And that was expressly in part of the record. There was over 1,000 pages of record and arguments and pleadings that the bankruptcy court expressly included in her decision. Now, I understand on the insolvency point, which gets you to another part of 548, that the trustee didn't hire anybody to figure out what insolvency was. That would be an expense. And what were the two sides arguing that allowed them to end up on January of 2013? Well, I've got two answers. First of all, that particular issue is not up on appeal. But to answer the substance of your question. It's not part of did the trustee do his job in evaluating the settlement? It's not part of it? The two items up on appeal are did the bankruptcy court abuse its discretion by applying a standard less than what is allegedly required in 1919? And I don't see why. Why doesn't that subsume everything about the settlement? As argued by Greif, the question is, does that good faith standard, is that something that should be applied to the trustee or not? Or is it the larger thing? Going with your argument, the issue is. Is this a fair settlement? Yeah, we had. Is this a reasonable settlement that we can review for abuse of discretion? Right. And so. Absolutely. Some of the other, there are subsidiary inquiries that go into that. To answer your specific. The trustee had spent five months doing informal discovery with American Express. It was substantive and it was deep. There are examples in the record of printouts in the trustees, the liquidating trustees' pleadings indicating, for example, balance sheets of the company going back in time. And then if you end up looking at the balance sheet of the company, it was actually solvent all the way to the date of the bankruptcy plea. So we had to go through and back out items that were implausible. And that backing out of items that were implausible, there was six or seven line items on the balance sheet that were carryover liabilities and so forth that needed to be backed out. And so by performing that analysis in Excel, we were able to generate an argument that it was in solvent a few months before that December time frame, December-January time frame. American Express, meanwhile, said, hey, you know, in opposition, we've got the following arguments. We think it's later than January. And we ended up in January simply because it was splitting the baby, so to speak. So how much would it have cost to do more than that? I mean, I think Judge Rastani is saying, well, you didn't hire an expert on that to come up with that. What does that cost usually? The trustee had estimated the overall cost of litigation was approximately $125,000, and that would have required two separate experts. One would have been an expert on solvency. The other one, interestingly, would have been an expert on the accounting of subprime financing companies, which is a very specific area that's got very specific accounting rules, as we discovered. And so it would have embedded in that overall litigation cost. It would have been about $50,000, $60,000 of that, or about half, just to hire the experts to generate an expert opinion report. And then there would have been a carryover. By the time they get the report done, you'd be into discovery. Now you're several months into it. So a good chunk of the overall litigation cost would have been expended at that point. And assessing what was the likelihood of prevailing, what information was? I know we talked about that the Coopers wouldn't be the best witnesses. That's right, Your Honor. But so what was the assessment of whether you'd win or not and who made that? That's right. Well, it depends on the claim, right? It was the trustee's informed good-faith judgment that, for example, the employment contract was not a very good claim for the reasonable value arguments that I had presented before. With respect to the insolvency arguments, it was the trustee's estimate that it was going to be extraordinarily difficult to go back just even a few more months before January because of the way that the company had been financed. For example, they had undergone a funding event the prior year. They were flush with cash at that point in time. You have to make an argument as to whether you're applying cash flow insolvency or balance sheet insolvency and so forth. So that was the bulk of what we had estimated in terms of having the, again, thousands of pages and many, many, many, many hours of analysis over five months as to why the trustee made an informed decision at that point in time. No other questions? Thank you very much. We don't appear to have additional questions. Thank you. Thank you. Let me ask you this. He says you failed to make the argument before us that the choice of the insolvency date was an abuse of discretion. I think I challenged and focused on the employment contract theory, but it was about the investigation into the — So you could answer that yes or no. Did you make that argument? Yeah. I mean, honestly, I was focusing on the employment contract theory. I thought it was the strongest and not the weakest claim in the complaint. So you didn't make that argument. I made an argument that there was a failure to properly investigate, and it was an abuse of discretion to stamp that there was adequate investigation. I want to point out two things. One is the trustee still won't answer the question that was asked, why under that narrow scope of the employment contract theory don't these other transfers qualify as being made under the employment contract, even under a narrow interpretation? Still will not answer that, and that's my problem. There is a declaration on file from the trustee that says only a preliminary analysis of the claims was conducted before they were settled. They may have spent five months negotiating that preliminary analysis, but there was still only a preliminary analysis. And I think what you can find here is that, at least from my perspective, the investigation is a pretext. And there's two new Nevada Supreme Court cases that I actually found yesterday. All right. When you say a pretext, that has sort of a — that generally — I mean, when we use that word, that it means, like, there's a pretext that they fired you really because you're black, not because you're incompetent, or a pretext has — So shallow, maybe, is a better word to use. Okay. Because pretext to me kind of is a — I don't think there's a — Like covering up something illegal as opposed to saying they didn't do enough and they — I mean, is there some motive here that we're not — that's not in the record? Well, is there anything in the record that would indicate, other than that you disagree with how they did their job, is there any pretext? There is a contingent — Pretext to me means they have some sort of illegal — I don't know if it's illegal, anything that happened here. I think that there was a contingent fee agreement that was in place that rewarded substantially a pretty decent settlement before an answer was even filed in the case or any discovery had happened. So I don't know what that motivated. That's just a fact that's in the record. I also want to hit on the second point. Well, I just think if you want to make — you know, if you want to say ill of someone in that sort of way, you have to kind of be able to back it up. If you want to disagree with their methods or that they didn't do enough, that's a different argument, and that's certainly one you can use. And I'm trying to dovetail it into the new Nevada Supreme Court cases. I talk about the business judgment rule and counsel what the business judgment rule requires. And the newest one is Jacksonville Police and Fire v. Brokaw. It's NRA DISH Network. There's no Pacific Reporter site yet. It was just decided a couple weeks ago on September 14th. It's at 133 Nevada Advance Report 61. And it talks about the protections of the business judgment rule and that you're entitled to them. And Nevada, a month before that, adopted a substantive rule, a business judgment rule, saying it's just not a procedural protection. It provides a substantive rule of law that courts won't second-guess a board or an officer. However, in order to get that protection, you have to show an adequate investigation. And what you're looking at, according to Jacksonville Police and Fire, is whether or not there's indicia in the record that there was an adequate investigation. And what I'm saying is there's no indicia, before I pointed it out, that the employment contract theory was considered at all in the settlement negotiations. And if you read the employment contract, it's particularly Article IV of the Coopers and employment contract. I don't know how you can get past the fact that these were reimbursements for expenses under the employment contract. I don't think you can get by it. And no one has answered that question for me, and that's why I'm sitting in this court. Kagan. Thank you. Thank you for your argument. Thank you both for your argument in this matter. And this will stand submitted. And the court is now in recess for the week. Thank you.
judges: Wallace, Callahan, Restani